UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JENNIFER JOHANSEN by and through her guardians, John and Kendra Johansen<br><br>Plaintiff,<br><br>v.<br><br>JERRY FOXHOVEN, in his official capacity as Director of the Iowa Department of Human Services,<br><br>Defendant. | Case No. 4:19-cv-141<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## I.    PRELIMINARY STATEMENT

1.    Plaintiff Jennifer Johansen ("Jennifer") by and through her guardians, John and Kendra Johansen, brings this complaint seeking declaratory and injunctive relief compelling the Director of the Iowa Department of Human Services ("DHS") to fully fund the cost of skilled nursing care so Jennifer can remain in her home and in the community, as required by the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

2.    Jennifer is a medically fragile 32-year-old. Jennifer is eligible for medical assistance under the Medicaid program. Part of Jennifer's Medicaid services are delivered through the Health Insurance Premium Payment Program (hereafter "HIPP"). HIPP reimburses the cost of Jennifer's private health insurance. Despite HIPP, Jennifer receives a majority of her services through the Intellectual Disability Waiver (the "Waiver").

3.    Jennifer requires assistance with all activities of daily living. She cannot walk, talk, eat unassisted, or bathe herself. Jenifer cannot move from one place to another without a caregiver

#3067891

physically transferring her. Jennifer has a tracheostomy which helps her breathe and she regularly experiences seizures.

4. Even with these challenges, Jennifer enjoys walks in her neighborhood, listening to music, and looking at picture books.

5. Due to Jennifer's significant disabilities, she requires one-on-one skilled nursing care 24 hours-per-day.

6. For most of her life, Jennifer received approximately 16 hours of in-home, skilled nursing services, with her parents covering the remaining eight hours.

7. Skilled nurses were qualified to manage Jennifer's significant medical needs, which included managing a feeding tube and tracheostomy, and responding to her seizures.

8. The Waiver only covers 10 hours of nursing services **per week**, with Medicaid providing another 10 hours.

9. The Johansen's private Blue Cross Blue Shield insurance policy does not cover any nursing services. Due to these limitations, Jennifer received the vast majority of her services through an Exception to Policy ("ETP") from the Iowa Department of Human Services which authorized services in excess of statutory waiver limits.

10. In January 2018, Jennifer's home nursing provider ("Provider") changed its policy and stopped providing home nursing care through a Waiver service called Supported Community Living ("SCL").

11. The Provider that made this decision told the Johansens that the decision was made for financial reasons.

12. Due to the Provider refusing to provide Jennifer's services, in February and again in April 2018, DHS authorized a more limited number of nursing care through a service called

Interim Medical Monitoring and Treatment ("IMMT"). However, beginning July 1, 2018, DHS refused to issue the needed ETP, which left Jennifer without the nursing services she needs.

13. Jennifer's parents and guardians, John and Kendra Johansen, bring this action on Jennifer's behalf, seeking declaratory relief, declaring that the State's reduction of these medically necessary services to be in violation of the Americans with Disabilities Act of 1990, as amended ("ADA"), and The Rehabilitation Act of 1973, as amended ("Rehabilitation Act"). Plaintiff also seeks injunctive relief enjoining the reduction of Jennifer's nursing services, and to compel the Court to restore her nursing services to 16 hours a day, 7 days a week.

## II.   JURISDICTION AND VENUE

14. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff, and all decisions affecting Plaintiff were made in Des Moines, Polk County, and all parties and the acts and omissions complained of below occurred in the State of Iowa.

## III.   PARTIES

16. Jennifer restates and re-plead paragraphs 1 through 15 as if fully stated herein.

17. John and Kendra Johansen are the parents and guardians of Jennifer Johansen and bring this action in their capacity as co-guardians for Jennifer. The Johansens live in Polk County, Iowa.

18. Jerry Foxhoven is the Director of the Iowa Department of Human Services. He is sued in his official capacity. DHS is the state agency charged with the administration of the Medicaid program in Iowa, and the agency which grants ETPs. DHS is a public entity under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, and its implementing regulations 28

C.F.R. § 35.104. DHS is also a recipient of federal funding and is therefore subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the regulations thereunder.

## IV. LEGAL BACKGROUND

A. <u>The Americans With Disabilities Act</u>

19. Jennifer restates and re-pleads paragraphs 1 through 18 as if fully stated herein.

20. ADA, codified at 42 U.S.C. §§ 12101–12181 was enacted for the purpose of the "elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

21. Title II of ADA prohibits discrimination against individuals with disabilities by public entities, including state and local governments, their departments, and agencies. 42 U.S.C. §§ 12131, 12132. "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. §§ 35.130(b)(1)(iv), 35.130(b)(7), 35.130(b)(8), and 35.130(d).

22. ADA requires services, programs, and activities of state and local governments to be administered in "the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

23. The "most integrated setting" means one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . " 28 C.F.R. § 35, App. B (2010). *See also*, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the ADA and Olmstead v. L. C., *available at*: http://www.ada.gov/olmstead/q&a_olmstead.htm (hereinafter "DOJ Olmstead Guidance").

24. The Supreme Court has interpreted the ADA's integration mandate and held that Title II prohibits unjustified segregation of people with disabilities. *Olmstead v. L.C.*, 527 U. S. 581, 600 (1999).

25. In *Olmstead*, the Court emphasized that unjustified isolation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and that it "severely diminishes the everyday life activities of individuals including family relations, social contacts, work options, economic independence, educational advancement and cultural enrichment." *Id.* at 600–01. The Court concluded that Title II requires public entities to offer services in the most integrated setting possible, including shifting programs and services from segregated to integrated settings, unless such a shift would result in a fundamental alteration of their service system. *Id.* at 607.

26. The United States Department of Justice has issued interpretive guidance on enforcement of Title II and Olmstead which explains that a

> public entity may violate the ADA's integration mandate when it: (1) directly or indirectly operates facilities and/or programs that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities and/or (3) through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs.

*See* DOJ Olmstead Guidance at 3, Question 2.

27. Regulations implementing ADA also provide: "A public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the entity's program with respect to individuals with disabilities . . . " 28 C.F.R. § 35.130(b)(3).

28.     ADA regulations further specify that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program or activity unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

29.     ADA requires state governments and agencies to make reasonable modifications to policies, practices, and procedures to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7).

B.      Section 504 of the Rehabilitation Act

30.     Section 504 prohibits discrimination against individuals with disabilities by any program or activity, including any department or agency of a State government, receiving federal financial assistance. 29 U.S.C. §§ 794(a) and (b). "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . " 29 U.S.C. § 794; 45 C.F.R. §§ 84.4(a), 84.4(b)(1)(i), (iv), and (vii); 84.4(b)(2); 84.52(a)(1), (4), and (5).

31.     Section 504 prohibits segregation of people with disabilities into institutions and requires services, programs and activities of state and local governments to be administered in "the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

32. Regulations implementing Section 504 also provide: "A recipient [of federal financial assistance] may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to handicapped persons . . . " 28 C.F.R. § 41.51(b)(3)(i); 45 C.F.R. § 84.4(b)(4).

33. Section 504 requires federally funded state governments and agencies to make reasonable modifications to policies, practices, and procedures to avoid discrimination on the basis of disability. 29 U.S.C. § 794(a).

## V.    FACTS

34. Jennifer restates and re-pleads paragraphs 1 through 33 as if fully stated herein.

35. Jennifer Johansen ("Jennifer") is a 32-year-old resident of Polk County, Iowa. Jennifer lives with her parents, John and Kendra.

36. John worked full-time as investigator for the Polk County Attorney's office until January 4, 2019.

37. Kendra formerly ran her own business, but stopped working when Jennifer lost most of her necessary nursing hours.

38. Jennifer was born with Moebius Syndrome and Dandy Walker Syndrome. Moebius Syndrome is a rare neurological disorder which affects the sixth and seventh facial nerves, resulting in weakness or paralysis of these nerves.

39. Thus, Jennifer cannot make facial expressions, suck, move her tongue, or talk.

40. Dandy Walker Syndrome has caused cysts to form on Jennifer's brain. Jennifer has had multiple brain surgeries, and has a shunt in the back of her skull. She has had no fewer than 18 shunt related surgeries, with the most recent being in March 2019.

41. Jennifer also suffers from other diagnoses which include Ulcerative Colitis, Gastro-Esophageal Reflux, Scoliosis, Epilepsy, Osteoporosis, and MRSA, a form of infection often resistant to antibiotics.

42. Jennifer cannot walk or talk.

43. Jennifer cannot chew food and is fed a pureed liquid diet, and receives medication and supplemental nutrition through a feeding tube.

44. Jennifer cannot use the toilet on her own and requires assistance with transfers to a commode.

45. Jennifer also has a tracheostomy, which helps her breathe.

46. Jennifer needs assistance managing and cleaning her tracheostomy. In fact, when Jennifer is frustrated or upset she sometimes pulls and dislodges her tracheostomy, which requires a care provider to replace it safely.

47. Jennifer can experience a seizure without warning. When Jennifer experiences a seizure, a care provider must respond to the seizures to keep her safe and stable.

48. Because Jennifer cannot talk, she is unable to tell care providers when something is wrong or when she needs assistance. Jennifer relies upon the skills and expertise of her care providers to assist with her daily living.

49. Jennifer's primary care physician believes skilled nursing services are necessary for Jennifer to remain safe and healthy in the community, and any decrease in the level of care would be detrimental.

50. Jennifer is occasionally hospitalized for complications related to her disability. Due to her significant medical needs the hospital provides an overnight "sitter," ensuring Jennifer is never left alone. This person can immediately call for help should any medical issue arise.

51. Jennifer's most recent Supports Intensity Scale (SIS) assessment ("Assessment") demonstrates that she requires "full physical support" for nearly every activity, and "partial physical assistance" with the others.

52. The Assessment also states "Jennifer needs twenty four hour skilled nursing care to support her tracheostomy, G-tube, and daily health needs".

53. For most of Jennifer's life, she has received in-home nursing services 16 hours-per-day, with her parents providing the remaining eight hours of care.

54. Iowa Medicaid provided this care through Medicaid state plan services, the Waiver, and an ETP to allow Jennifer to receive nursing services in excess of the statutory waiver cap of 10 hours of nursing hours per week. Jennifer's nursing provider originally provided the nursing care as SCL, a service allowed under the Waiver.

55. For many years, Jennifer's case manager submitted an ETP request to the DHS Director, explaining Jennifer's complex medical needs and why the limited number of services allowed for under the Waiver would not sufficiently meet Jennifer's needs.

56. Each year the DHS Director issued an approval letter, acknowledging Jennifer's need for skilled care and approving services in excess of the statutory limits for the Waiver.

57. On January 31, 2018, Jennifer's nursing provider, UnityPoint Health, informed the family, that due to business and monetary reasons, it would no longer provide nursing services through SCL, as the Medicaid reimbursement rate was too low.

58. John Johansen requested, and was granted, a meeting with DHS Director Jerry Foxhoven ("Defendant") on February 19, 2018 to discuss his concerns that Jennifer would no longer be receiving the nursing care she needed.

59. On February 28, 2018 Director Foxhoven issued an ETP for 12 hours-per-day of Interim Medical Monitoring and Treatment (hereafter "IMMT") services to be used from March 1 through April 30, 2018. DHS later extended the ETP through June 30, 2018.

60. The ETP stated, "It is imperative to utilize the least costly services available to meet Ms. Johansen's needs. This includes maximizing the available services under the state plan and waiver services . . . Please be advised no further exceptions to policy will be considered without a plan in place to address Ms. Johansen's ongoing supports needs. Ongoing services approved through the exception to policy process to support Ms. Johansen is not sustainable."

61. In June 2018, Jennifer's case manager requested another ETP, explaining nonskilled care providers are unable to provide the level of skilled care that Jennifer requires, due to her significant disabilities and medical needs. Alternative in-home nursing providers do not provide overnight care and have waiting lists for their day services. Jennifer's case manager called no fewer than 23 alternative providers.

62. Despite the exploration and exhaustion of all available alternatives, on July 6, 2018 Director Foxhoven's response to the June ETP request approved only eight additional nursing hours per week and requested that she utilize Consumer Directed Attendant Care, Respite and Supported Community Living Services. The response went on to say, "it is imperative to utilize the least costly services available to meet Ms. Johansen's needs."

63. Jennifer is currently receiving eight hours of nursing services 4–5 days-per-week. This is far below the necessary 16 hours-per-day she needs.

64. Kendra suffers from spinal canal stenosis. Her back pain makes it impossible to move or transfer Jennifer. Kendra receives injections to manage the pain and sees a physical therapist as needed, but doctors are suggesting surgery is the only option to improve her condition. During Kendra's recovery, her ability to care for Jennifer will be limited even further.

65. Before John retired, he left for work at 7:00 a.m. every morning after caring for Jennifer from 11:00 p.m. until 6:00 a.m. John would return home at 4:00 p.m. In the early evening, John assisted Kendra in taking care of Jennifer and preparing Jennifer's evening meal.

66. After nearly a year, this schedule was not sustainable and John was forced to take an early retirement from the Polk County Attorney's Office in order to properly care for Jennifer.

67. Kendra's parents, who are in their 70's, come to the house at approximately 6:00 p.m. when John goes to bed. Jennifer's 75-year-old grandfather handles all transfers while John is sleeping.

68. From 6:00 p.m. to 11:00 p.m. every night, Jennifer requires multiple types of care to keep her healthy. This includes flushing her feeding tube with water to provide supplemental hydration, crushing of medications and mixing with water, then administering medications via the feeding tube, responding to any seizure activity and multiple transfers to use the toilet.

69. John wakes at approximately 11:00 p.m. to allow Kendra time to sleep. Kendra's parents then return to their own home. From approximately 11:00 p.m. until 6:00 a.m., John provides the necessary care and supervision for Jennifer. This care includes evaluation of her tracheostomy, flushing of her feeding tube, and administration of medications.

70. On days Jennifer has approved nursing care, the nurse arrives at approximately 7:00 a.m. and stays until 3:00 p.m. John and Kendra use this time to run errands, attend appointments, and catch up on much needed sleep and time together.

71. The use of Jennifer's parents as unpaid natural support is not sustainable.

72. In an effort to provide the Johansen family some relief for a short period of time, the Polk County Board of Supervisors approved 186 hours of nursing monthly from October 1, 2018 through September 30, 2019.

73. Between the services provided through Medicaid, the Waiver, and Polk County, Jennifer is approved for 265 units a month, or slightly fewer than nine hours per day. This is far short of the necessary 16 hours of in-home services Jennifer needs.

74. Jennifer and her family want Jennifer to stay at home and receive the care she needs to remain part of her community.

75. Left with few options, Jennifer's case manager explored the possibility of a nursing home.

76. Of the 35 nursing homes Jennifer's case manager contacted, most stated they are unable to provide care for an individual with a tracheostomy.

77. Not one nursing home that Jennifer's case manager contacted could guarantee Jennifer would receive the constant supervision she requires to stay safe.

78. The State of Iowa operates two state Resource Centers, one of which includes a medically fragile unit. This facility, Glenwood Resource Center, could accommodate Jennifer's disabilities and high medical needs, but they are currently operating on a waiting list.

79. The daily Medicaid rate for Glenwood Resource Center is more than $900 per day, or approximately $328,500 a year.

80. The last calculation for Jennifer's care is listed in the approved ETP from February 2017, which indicated her annual Medicaid costs were $224,711.90.

81. Thus, Glenwood Resource Center is significantly more expensive than the cost of 16 hours of nursing care per day that could be provided to Jennifer in her home.

82. There is no other available avenue for which to pursue relief, as the Iowa Administrative Code does not allow for appeals on denials of the ETP and Jennifer's nursing services have long been provided through the ETP process.

## VI. LEGAL CLAIMS

### A. VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

83. Jennifer restates and re-pleads paragraphs 1 through 82 as if fully stated herein.

84. Jennifer is a "qualified individual with a disability" within the meaning of 42 U.S.C. §12131(2) because she has a disability that significantly limits her major life activities, meets the essential eligibility requirements for services under Medicaid and the Intellectual Disability Waiver, and she is capable of living safely in the community with a reasonable modification to the program, which limits skilled nursing hours.

85. The ADA Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of the qualified individuals with disabilities." 28 CFR §35.130(d).

86. The Defendant violated the Americans with Disabilities Act and its implementing regulations 28 C.F.R. §§ 35.130 by refusing to provide Jennifer with medically necessary nursing services, which could lead to unnecessary institutionalization.

87. Defendant's refusal to provide medically necessary nursing services threatens Jennifer's full integration into the community and her ability to remain at home in violation of the ADA and its implementing regulations.

**B. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**

88. Jennifer restates and re-pleads paragraphs 1 through 87 as if fully stated herein.

89. Jennifer is a qualified individual with a disability within the meaning of Section 504 because she has a disability that limits her major life activities and meets the eligibility requirements for Medicaid and the Intellectual Disability Waiver. 45 C.F.R. §84.3 (j) and (m); 45 C.F.R. § 84.3(1)(4).

90. The Rehabilitation Act's regulations require entities receiving federal financial assistance to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

91. Defendant violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and its implementing regulations 28 C.F.R. 41.51(d) and 45 C.F.R. § 84.4(b)(4) by refusing to provide Jennifer with medically necessary nursing services, placing her at risk of unnecessary institutionalization and segregation.

## VII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following relief:

a. Issue declaratory judgement that Defendant's actions are in violation of the ADA and Section 504.

b. Grant permanent injunctive relief enjoining Defendant from denying Plaintiff's Medicaid services, and require Defendant to reinstate nursing services the Department previously denied.

c. Award Plaintiff the costs of this action and reasonable attorney's fees pursuant to 29 U.S.C. § 794a and 42 U.S.C § 12205.

d. Grant such other relief which the Court deems just and equitable.

/s/ Abhay M. Nadipuram
Abhay M. Nadipuram, AT0011947
Sarah K. Franklin AT0009630
Davis Brown Law Firm
215 10th Street, Suite 1300
Des Moines, IA 50309
Telephone: 515-288-2500
Email:   SarahFranklin@davisbrownlaw.com
         AbhayNadipuram@davisbrownlaw.com

/s/ Emily Ehlers
Cyndy Miller, AT0005382
Emily Ehlers, AT0012536
Disability Rights Iowa
400 East Court Avenue, Suite 300
Des Moines, IA 50309
Telephone: 515-278-2502
Email:   eehlers@driowa.org
         cmiller@driowa.org

**ATTORNEYS FOR PLAINTIFF**

| PROOF OF SERVICE |
|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on May 7, 2019 by: |
| ☐ U.S. Mail         ☐ FAX |
| ☐ Hand Delivered    ☒ Email |
| ☐ Federal Express   ☐ Other: CM/ECF |
| Signature: /s/ Abhay M. Nadipuram |